UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JENNIFER BARTIE o/b/o HER DECEASED SON JAVON KENNERSON, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VERSUS | ) | CASE NUMBER: 1:21-CV-4074 |
| | ) | |
| LASALLE MANAGEMENT COMPANY, L.L.C., LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, SECRETARY JAMES M. LEBLANC, CATAHOULA CORRECTIONAL CENTER, SHERIFF TONEY EDWARDS, SHERMAN FORD, JEREMY WILEY, BEN ADAMS, RANDY STOCKMAN, BLAKE LEBLANC, PAT BOOK, WARDEN SHERMAN FORD, WARDENY JEREMY WILEY, ASST. WARDEN ERICT STOTT, CLARA HODAS, LILLIE BROWN, ASHLI OLIVEAUX, SELENA HOLMES, JOHN DOE #1, JOHN DOE #2, JOHN DOE #3, JOHN DOE #4, JOHN DOE #5, JOHN DOE #6, JOHN DOE #7, JOHN DOE #8, JOHN DOE #9, JOHN DOE #10, ABC INSURANCE COMPANY, XZY INSURANCE COMPANY, RST INSURANCE COMPANY. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

---

## SECOND AMENDED COMPLAINT

---

NOW INTO COURT, through undersigned counsel, comes the Plaintiff, Jennifer Bartie,

on behalf of her deceased son Javon Kennerson (hereinafter "Plaintiff"), who is domiciled and resides in Rapides Parish, respectfully represents the following:

## PRELIMINARY STATEMENT

1.

This is a civil rights action concerning the death of Javon Kennerson when he was in the custody of the Louisiana Department of Public Safety and Corrections and incarcerated at Catahoula Correctional Center, a private prison facility operated by LaSalle Management Company, LLC.

2.

Despite Mr. Kennerson's severe and obvious mental health condition, Defendants provided him with such inadequate monitoring and supervision that he was able to obtain and smoke poisonous insecticide while he was on suicide watch.

3.

Defendants also repeatedly failed to provide Mr. Kennerson with medical treatment when he sustained injuries from self-harming actions.

4.

Mr. Kennerson's tragic death is the result of LaSalle's policy of inadequately monitoring incarcerated people on suicide watch. LaSalle facilities were found out of compliance with minimum suicide prevention standards 29 times in the last 5 years. At least ten incarcerated people have died by suicide in LaSalle facilities while on suicide watch since 2016.

5.

LaSalle also has an extensive and documented history of providing inadequate and inappropriate medical treatment to incarcerated people suffering from severe physical and mental

health conditions.  LaSalle prioritizes profit over the health and safety of people in its facilities. Every dollar not spent on medicine, supplies, and staff for the facilities it operates is profit for its owners.

6.

The Louisiana Department of Public Safety and Corrections has continued to contract with LaSalle for prison services notwithstanding their documented history of inadequate supervision and failure to provide medical treatment.

7.

Plaintiff seeks relief for the harm they suffered from all of the responsible parties.

**JURISDICTION AND VENUE**

8.

The United States District Court has jurisdiction over the subject matter of this complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§§ 1331, 1343(a)(3), and 1367(a).

9.

The Western District of Louisiana is the appropriate venue to bring this complaint pursuant to 28 U.S.C. § 1391 because  the facts that give rise to Plaintiff's claims all took place within the Western District of Louisiana.

**PARTIES**

10.

Jennifer Bartie is the mother of Javon Kennerson and is a person of full age of majority.

Made Defendants herein are the following:

a) CATAHOULA CORRECTIONAL CENTER ("C.C.C."), a private prison facility in Harrisonburg, Catahoula Parish, owned and operated by private company LASALLE MANAGEMENT COMPANY through contracts with the LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS. This private prison is

obliged to ensure the medical and mental health of incarcerated people in the custody of the Louisiana Department of Public Safety and 1Corrections that are housed there.

b) LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS ("D.O.C."), is a governmental entity and department of the State of Louisiana, which at all relevant times was responsible for the health, safety, and well-being of Javon Kennerson, a person committed to D.O.C.'s custody. The D.O.C. is the recipient of federal funds. The D.O.C. can be served at 504 Mayflower Street, Baton Rouge, LA 70802.

c) JAMES M. LEBLANC is the Secretary of Louisiana's D.O.C., in his official capacity. In his capacity as Secretary, he is responsible for the functioning and control of all programs within D.O.C. He formulates rules and regulations and determines policy regarding management, personnel, and total operations. He leads and supports central office and field unit staffs, which are charged with carrying out the work of the agency. By law, he is responsible for protecting the constitutional rights of all persons held in D.O.C.'s custody. At all relevant times, LeBlanc was acting under color of law and as the agent and official representative of D.O.C. He can be served at 504 Mayflower Street, Baton Rouge, LA 70802.

d) LASALLE MANAGEMENT COMPANY, LLC is a Louisiana Corporation that has its principal place of business in Ruston, Louisiana. LASALLE MANAGEMENT COMPANY maintains an office in Ruston, Louisiana and operates at least nine (9) correctional facilities in Louisiana, as well as others in Texas, New Mexico, and Georgia. LASALLE MANAGEMENT COMPANY'S registered agent in Louisiana is William K. McConnell at 192 Bastille Lane, Suite 200, Ruston, LA 71270.

e) ABC Insurance Company is an insurance company authorized to do and doing business in the State of Louisiana providing general liability coverage for Catahoula Correctional Center and/or LaSalle Management Company, LLC.

f) XYZ Insurance Company is an insurance company authorized to do and doing business in the State of Louisiana providing general liability coverage for the Louisiana D.O.C.

g) SHERIFF TONEY EDWARDS was at all times relevant to this complaint the Sheriff of Catahoula Parish, a person of full age of majority domiciled in Catahoula Parish. Through contractual relationships with Defendants D.O.C. and LaSalle Management Company, Sheriff Edwards had responsibility in overseeing and ensuring the health of incarcerated people at C.C.C. He is sued in his official capacity.

h) RST Insurance Company is an insurance company authorized to do and doing business in the State of Louisiana providing general liability coverage for Catahoula Parish Sheriff and his employees.

i) SHERMAN FORD was at all times relevant to this complaint the Warden of C.C.C., a person of full age of majority and a resident of Louisiana. He is sued in his individual

and official capacities.

j)   JEREMY WILEY was at all times relevant to this complaint also a Warden of C.C.C. and is, upon information and belief, a person of full age and of majority, domiciled in Louisiana. He is sued in his individual and official capacities.

k)   ERIC STOTT was at all times relevant to this complaint the Assistant Warden of C.C.C., a person of full age of majority and a resident of Louisiana. He is sued in his individual and official capacities.

l)   BEN ADAMS was at all times relevant to this complaint the Chief Operational Officer at C.C.C. and is, upon information and belief, a person of full age and of majority, domiciled in Louisiana. He is sued in his individual and official capacities.

m)  RANDY STOCKMAN was at all times relevant to this complaint the Captain of Patrol at C.C.C. and is, upon information and belief, a person of full age and of majority, domiciled in Louisiana. He is sued in his individual and official capacities.

n)   PAT BOOK was at all times relevant to this complaint the Chief Warden of C.C.C. for LaSalle Management Company and is, upon information and belief, a person of full age and majority, domiciled in Louisiana. He is sued in his individual and official capacities.

o)   BLAKE LEBLANC was at all relevant times to this complaint working for the D.O.C. in charge of overseeing mental health issues with incarcerated people throughout the D.O.C. system. He is, upon information and belief, a person of full age and majority, domiciled in Louisiana. He is sued in his individual and official capacities.

p)   ASHLI OLIVEAUX was at all relevant times to this complaint employed at the D.O.C. Headquarters to assess the proper placement of incarcerated people in D.O.C. custody based on their health and mental health needs to ensure their safety. She is, upon information and belief, a person of full age and majority, domiciled in Louisiana. She is sued in her individual and official capacities.

q)   SELENA HOLMES was at all relevant times to this complaint working for the D.O.C. in charge of overseeing mental health issues with incarcerated people throughout the D.O.C. system. She is, upon information and belief, a person of full age and majority, domiciled in Louisiana. She is sued in her individual and official capacities.

r)   CLARA HODAS was at all relevant times to this complaint a mental health administrator at D.O.C. who was in touch with or had knowledge of C.C.C.'s warnings of Mr. Kennerson's deteriorating physical and mental health. She is, upon information and belief, a person of full age and majority, domiciled in Louisiana. She is sued in her individual and official capacities.

s)   LILLIE BROWN was at all relevant times to this complaint a mental health supervisor at D.O.C. who was in touch with or had knowledge of C.C.C.'s warnings of Mr.

Kennerson's deteriorating physical and mental health. She is, upon information and belief, a person of full age and majority, domiciled in Louisiana. She is sued in her individual and official capacities.

t)  JOHN DOES #1-5 were at all times relevant to this complaint employees at C.C.C. or LaSalle Management Company assigned to the tier housing Mr. Kennerson, and are, upon information and belief, persons of full age and of majority, domiciled in Louisiana. They are sued in their individual capacities.

u)  JOHN DOE #6-10 were at all times relevant to this complaint responsible for providing medical and mental health treatment and care to people incarcerated at C.C.C., including Mr. Kennerson during his incarceration and prior to his death.

v)  At all times relevant to this complaint, all Defendants acted in concert and conspiracy andwere jointly and severally responsible for the harms caused to Plaintiff.

w)  At all times relevant to this complaint, all Defendants acted under the color of state law.

x)  THIS PETITION PUTS ON NOTICE ANY EXCESS POLICY COVERING THE CATAHOULA PARISH SHERIFF'S OFFICE, SHERIFF EDWARDS, ANY EMPLOYEE OF THE CATAHOULA CORRECTIONAL CENTER, THE LOUISIANA DEPARTMENT OF CORRECTIONS AND ALL ITS EMPLOYEES, AND LASALLE MANAGEMENT COMPANY AND ALL OF ITS EMPLOYEES, AND ANY POTENTIAL UNION POLICY COVERING THE INDIVIDUAL SHERIFF DUPUTIES NAMED INDIVIDUALLY IN THIS SUIT.

## FACTUAL ALLEGATIONS

***LaSalle Management Company Maintains a Policy of Inadequate Supervision of Vulnerable Incarcerated People in its Facilities***

11.

Prison and jail auditors have found that LaSalle facilities failed to meet minimum state and federal standards for supervising mentally ill incarcerated people at least 29 times in the last five years.

12.

Auditors observed numerous instances where LaSalle did not conduct required cell checks or observations of mentally ill and suicidal incarcerated people:

a. The Department of Homeland Security Office of Detention and

Oversight found that LaSalle's River Correctional Center failed to conduct observations of an individual who was on suicide watch in May 2021;

b. In October 2020, LaSalle's Winn Correctional Center was found to have inadequate camera monitoring of the facility;

c. The Department of Homeland Security Office of Detention and Oversight found that LaSalle's Irwin County Detention Center failed to personally observe people on suicide watch in 2020;

d. The Texas Commission of Jail Standards found that LaSalle's Fannin County Jail was not meeting state standards on face-to-face observations of suicidal and mentally ill incarcerated people in 2018 and 2019;

e. The Texas Commission of Jail Standards found that LaSalle's Jack Harwell Detention Center was not meeting state minimum standards on face-to-face observations of suicidal and mentally ill incarcerated people in 2018 and 2019;

f. The Department of Homeland Security Office of Detention and Oversight found that LaSalle's Richwood Correctional Center did not conduct timely cell checks of people housed in the special management unit on one (1) occasion in December 2019; six (6) separate occasions in December 2020; and once again in October 2021;

g. The Texas Commission of Jail Standards found that LaSalle's Johnson County Jail was not meeting state standards on face-to-face observations of suicidal and mentally ill incarcerated people in 2018;

h. The Texas Commission of Jail Standards found that LaSalle's Limestone County Jail was not meeting state standards on face-to-face observations of suicidal and mentally ill incarcerated people in 2018; and

i. The Texas Commission of Jail Standards found that LaSalle's Willacy County Jail was not meeting state standards on face-to-face observations of suicidal and mentally ill incarcerated people in 2020.

13.

Auditors have also found on numerous occasions that LaSalle facilities had inadequate training and policies on suicide prevention, including but not limited to:

a. In 2019, an auditor found that LaSalle staff at the Johnson County, Texas facility had not been trained on suicide intervention or prevention;

b.  In December 2019, the DHS Office of Detention and Oversight found that staff at Richwood Correctional Center had only received one hour of training during orientation;

c.  In December 2020, the DHS Office of Detention and Oversight found LaSalle's Jackson Parrish Facility had a suicide prevention and intervention program that was not approved by a clinical medical authority;

d.  In 2020, the Texas Commission on Jail Standards found that LaSalle staff at Rolling Plains Detention Center were not conducting timely screenings of individuals who had mental disabilities or a suicide risk;

e.  In 2020, the DHS Office of Detention and Oversight found LaSalle's West Texas Detention Facility allowed staff with no mental health training to remove a detainee from suicide watch monitoring. The same audit found the facility did not have a preliminary incident report to record detainee suicide attempts;

f.  In 2021, LaSalle's San Luis, Arizona facility was found to have deficiencies in its suicide intervention and prevention policies;

g.  In 2021, the DHS Office of Detention and Oversight found LaSalle's Irwin County Detention Center failed to evaluate the mental health of three different detainees when they were discharged from suicide watch; and

h.  A February 2020 DHS audit of LaSalle's Winn County Correctional Center revealed that the facility was not conducting timely mental health evaluations of individuals who were presenting signs of distress.

14.

LaSalle facilities regularly fail to secure dangerous instruments that incarcerated people could use to self-harm or commit suicide.

a.  A March 2021 DHS audit of LaSalle's Winn Correctional Center found sharp mortar and concrete pieces in the facility's isolation room that could be used to facilitate a suicide.

b.  An October 2019 DHS audit of LaSalle's River County facility revealed that handmade ropes and strings were found in all housing units.

c.  An October 2017 audit of the Irwin County facility revealed that syringes were not secured or inventoried.

15.

LaSalle facilities regularly fail to initiate timely transfers of incarcerated people with severe mental health conditions that their staff lack the resources or capacity to handle. For instance, a 2019 DHS audit of LaSalle's Richwood Correctional Center found that the facility placed a mentally ill detainee in administrative segregation when he should have been transferred to another facility where he could receive treatment.

16.

On information and belief, LaSalle's inability to adequately supervise suicidal incarcerated people is due in part to chronic staffing shortages in its facilities.

17.

LaSalle's failure to adequately supervise mentally ill and suicidal incarcerated people has led to a number of incarcerated people dying by suicide in LaSalle facilities.

18.

At least nine people, in addition to Mr. Kennerson, have died by suicide in LaSalle facilities since 2015 including:

a.  Michael Martinez, an incarcerated person in LaSalle's Jack Harwell Detention Center, died by hanging in his cell from a bed sheet he had woven through the metal smoke detector cover in his cell in 2015.

b.  Johnny Wilson, an incarcerated person at LaSalle's Winn Correctional Center, died by hanging in his cell from a sheet tied to the cell bars in 2016.

c.  Kristian Jesse Culver, an incarcerated person in LaSalle's Jack Harwell Detention Center, died by hanging in his cell from a ventilation grill in

2016.

d.  Kennie Moore, an incarcerated person at LaSalle's Rolling Plains Detention Center, died by hanging on the door to the recreational yard in 2016.

e.  Royland Diaz, an incarcerated person in LaSalle's Richwood Correctional Center, died by hanging in his cell from a bed sheet tied to the top bunk in 2019.

f.  Michael Lowell Rodden, an incarcerated person in Bi-State Justice Center, operated by LaSalle from 2010 – 2021, died by hanging in his cell from a bolt that was securing metal to the exterior window of his cell in 2019 after facility staff failed to regularly check on him despite his placement on suicide watch.

g.  Joshua Allen Sees, an incarcerated person in LaSalle's Jefferson County Downtown Jail, died by hanging in his cell with cloth from his bedding in 2020.

h.  Vicki Lynn Lamb, an incarcerated person at LaSalle's Parker County Jail, died by overdosing on medication in 2020.

i.  David Brian Hamilton, an incarcerated person at LaSalle's Parker County Jail, died by hanging in his cell in 2021.

**LaSalle Management Company Maintains a Policy of Failure to Provide Medical Care to Incarcerated People Suffering from Severe Medical Conditions, Including Failure to Provide Emergent Care to Incarcerated People Following their Suicide Attempts**

19.

LaSalle facilities have been sued and cited for their failure to provide prompt and adequate medical care to individuals suffering from injuries and illness.

20.

Auditors and jail inspectors have repeatedly cited LaSalle facilities for failing to meet minimum requirements on the provision of medical care to incarcerated people.

21.

Since 2015, dozens of incarcerated people have died in LaSalle facilities due to lack of

treatment or delay of treatment of their medical conditions, including the following:

  a. In 2019, Joplin Graham died in LaSalle's C.C.C. facility after he suffered an incident that exacerbated his asthma and left him unable to breathe.

  b. In 2019, Holly Barlow Austin died after she was incarcerated in LaSalle's Bi-State Justice Center after she was deprived of her HIV medication and contracted meningitis as a result. She became blind and spent two days confined to the floor of a medical observation cell without food or water before she was finally taken to a hospital emergency room where she died.

  c. In 2019, Royland Diaz died in LaSalle's Richwood facility after he hung himself and LaSalle staff failed to render timely medical care.

  d. In 2017, Michael Sabbie died in LaSalle's Jack Harwell facility after staff failed to monitor and treat his hypertension.

  e. In 2016, Morgan Angerbauer died in LaSalle's Jack Harwell facility. Angerbauer's estate sued LaSalle alleging staff failed to monitor his blood sugar.

  f. In 2016, Erie Moore died in LaSalle's Richwood facility after staff failed to render timely care after he was slammed on the ground and rendered unconscious by guards.

  g. In 2016, Ronald Ray Beesley died in LaSalle's Johnson County facility after he was unable to receive treatment for an injury he sustained in a car crash despite submitting multiple medical request forms and verbalizing his distress.

  h. Another incarcerated person's family sued for wrongful death for their family member who suffered an asthma attack at the LaSalle-run Madison Parish Correctional Center. They were denied treatment or resuscitation attempts for over an hour causing them to needlessly perish.

22.

Hundreds of incarcerated people and detainees in LaSalle facilities have alleged they did not receive medical care despite repeated requests for help and displays of obvious signs of distress, including the following:

a.  In 2017, Lane Carter, an incarcerated person at LaSalle's Winn Correctional facility, suffered a debilitating injury after he fell in the shower. He received no physical therapy and was denied a wheelchair despite multiple requests for care while he was incarcerated at LaSalle's Winn and Jackson Parish facilities. LaSalle settled the case for $405,000.

b.  Kevin Jones, an incarcerated person in LaSalle's C.C.C. facility, was denied doctor-ordered medication for his hemorrhoids and staff refused his multiple requests for access to medication. After Mr. Jones' condition worsened to the point that he could no longer walk, LaSalle waited a week until they sent him to the hospital where he had to have emergency surgery. LaSalle settled the case.

c.  Keith Davis, an incarcerated person at LaSalle's Richwood facility, received no medical care after he sustained severe injuries following an assault by a lieutenant.

d.  William Scott James, a detainee at LaSalle's Bi-State facility, sustained severe injuries when he was assaulted in jail but received no treatment. When he was discharged, Mr. James went directly to a hospital emergency room where he was diagnosed with multiple fractures, acute renal failure, and severe dehydration.

24.

LaSalle maintains a policy of forcing people with urgent health care needs to wait until a nurse or doctor visits the facility to receive care. For instance, Lane Carter was instructed that he would have to wait three days until the nurse was scheduled to return to Winn Correctional Center to receive a medical evaluation despite reporting excruciating pain. A number of incarcerated people at C.C.C. have also alleged in lawsuits that they were forced to wait until Wednesday, when a doctor was at the facility, to receive care for urgent medical problems.

25.

Auditors have found that LaSalle facilities do not have adequate emergency care policies in place. For instance, a 2022 report by the Office of the Inspector General found that emergency care was an area of concern for LaSalle's Irwin County facility. An October 2021 inspection of Jackson Parish revealed the facility had missing entries in the maintenance logs for the AED and

medical bags.

**D.O.C. Has Continued to Contract with LaSalle Despite its Extensive History of Indifference to the Safety and Medical Needs of Incarcerated People**

26.

Upon information and belief, D.O.C. and Defendant James LeBlanc were aware of the inspection findings and lawsuits against LaSalle but took no actions to terminate D.O.C.'s contract with LaSalle, provide more intensive oversight over LaSalle's privately run prisons, nor make any extra accommodations for those sick or mentally ill incarcerated people housed at LaSalle facilities in violation of constitutional law, the Americans with Disabilities Act ("ADA"), or state law.

27.

D.O.C. is also aware of LaSalle's treatment of incarcerated people in its Louisiana facilities because they are regularly consulted for direction and instruction when mental health or medical issues arise.

28.

D.O.C. entered into a new contract with LaSalle as recently as 2019 when it decided to renew its contract with the company to operate Winn Correctional Center.

**D.O.C. Provides Inappropriate Housing and Inadequate Mental Health Care to Incarcerated People with Mental Illness**

29.

D.O.C. does not have enough trained staff or rehabilitative housing units to serve the number of incarcerated people living with mental illness in D.O.C. custody.[1] Accordingly, D.O.C. regularly houses incarcerated people suffering from severe mental illness in facilities that lack

---

[1] *Adequacy of Healthcare Provided in Louisiana State Prisons*, VOTE NOLA 8-9 (May 2021), https://www.vote-nola.org/uploads/6/4/9/8/64988423/dpsc_healthcare_brief.pdf.

adequate supervision and access to care for their conditions.

30.

D.O.C. maintains a practice of housing suicidal incarcerated people in facilities where they cannot be properly and humanely monitored. Upon information and belief, a number of D.O.C. facilities lack adequate staff to conduct frequent cell checks to prevent suicide attempts.[2] Staff assigned to units where suicidal incarcerated people are housed also lack adequate training to properly supervise vulnerable populations.[3]

31.

Upon information and belief, several D.O.C. facilities do not have the infrastructure and equipment to safely house suicidal incarcerated people, including a lack of rehabilitative housing units[4] and suicide restraint mattresses.

32.

D.O.C. facilities almost uniformly lack the medical staff necessary to provide appropriate mental health care. Several facilities only have one contracted psychiatrist to oversee medication and treatment regimens for hundreds of patients.[5] For instance, D.O.C. houses incarcerated people with severe mental conditions in David Wade Correctional Center ("D.W.C.C.") where they receive an average of five minutes with a psychiatrist every 90 days. People incarcerated at Raymond Laborde Correction Center have access to a psychiatrist once every two weeks.[6] Allen

---

[2] David Cloud et. al., *The Safe Alternatives to Segregation Initiative*, VERA Center on Sentencing and Correction 10 (May 2019) https://www.vera.org/downloads/publications/safe-alternatives-segregation-initiative-findings-recommendations-ldps.pdf

[3] *Id.* at 74

[4] *Id.* at10

[5] *Id.* at 50

[6] *Adequacy of Healthcare Provided in Louisiana State Prisons*, May 2021, https://www.vote-nola.org/uploads/6/4/9/8/64988423/dpsc_healthcare_brief.pdf (last visited March 9, 2022).

Correctional Center provides incarcerated people access to a psychiatrist one day per week.[7]

33.

D.O.C. also maintains a practice of denying or delaying transfers for incarcerated people with severe mental illness to facilities where they would have access to more intensive care. At one facility, the treating psychiatrist was not aware of a single instance of a person being transferred to a facility that provided more robust mental health treatment options despite the facility housing over 100 people with diagnosed mental illnesses and numerous requests from incarcerated people to be transferred to a facility with more robust mental health services.[8]

*C.C.C. Practices and Medical Procedures*

34.

C.C.C. is a private prison run by LaSalle Management Company via contract with D.O.C. While LaSalle operates this facility, both it and D.O.C. are fully and individually responsible for the health, including mental health, of the people in custody at C.C.C.

35.

C.C.C. is overseen by Defendant Sheriff Toney Edwards, Warden Sherman Ford, Warden Jeremy Wiley, Assistant Warden Eric Stott, Chief Operation Officer Ben Adams, Captain of Patrol Randy Stockman, and Chief Warden Book. Upon information and belief, a number of the individuals above, including Sheriff Edwards and other Defendants listed but yet to be identified by Plaintiff, were employed by the Catahoula Parish Sheriff's Office and worked at C.C.C.

36.

On information and belief, C.C.C. forces incarcerated people to wait until Wednesdays,

---

[7] *Id.*
[8] *Tellis v. LeBlanc*, 5:18-cv-0054 ECF 418-2, Ex. A

when medical providers are scheduled to be at the facility, to receive urgent medical evaluations and care. In 2020, detainee Sami Kaleva Kivinen was forced to wait until Wednesday to receive treatment for a severe arm injury after he ruptured his bicep tendons. In 2006, a detainee who requested medical care was told he would have to wait until Wednesday to receive medical care.

37.

Multiple people incarcerated at C.C.C. have alleged they experienced delays of six to seven days for medical evaluations. For instance, Anthony Duane Craig and Jeremiah Jermaine Love both waited days after reporting a severe medical condition before seeing a medical professional.

38.

C.C.C. does not provide psychiatric care and the facility does not facilitate regular access to mental health treatment from service providers outside of the facility.

39.

Since 2018, at least three people in addition to Mr. Kennerson died due to injuries they sustained or medical complications they developed in C.C.C.

     a. Kevin Percle died in 2018 after sustaining a head injury while in C.C.C. custody.

     b. Joplin Graham died after C.C.C. refused to provide him with medical treatment or medication.

     c. Luis Sanchez-Perez, an incarcerated person at C.C.C., died in 2020 due to septic shock from pseudomonas leading to cardiopulmonary arrest.

40.

C.C.C. has a policy of not recording serious injuries suffered by incarcerated people in their facility. For instance, C.C.C. failed to record the injuries that caused Kevin Percle's death. The cause of his injury was only uncovered during a subsequent, independent investigation.

***Background on D.O.C. Custody of Mr. Kennerson***

41.

Javon Kennerson was born in 1983. He was 37 years old when he died on December 27, 2020 while in the care and custody of D.O.C.

42.

In 2013, Mr. Kennerson was convicted of an offense for which he was sentenced to the custody of the D.O.C. for twenty (20) years. Mr. Kennerson was remanded to D.O.C. custody in or around 2013.

43.

From the time Mr. Kennerson was remanded to D.O.C. custody in 2013 through his death on December 12, 2020, he remained in D.O.C. custody. During this entire period, D.O.C. was fully responsible for ensuring Mr. Kennerson's health and providing proper health care, as well as preventing self-harm.

44.

Prior to Mr. Kennerson's incarceration, he suffered none of the psychotic or mental illness symptoms that he manifested in his last weeks of life while in D.O.C. custody, including at C.C.C. Nor did he suffer any of the physical maladies that killed him on December 12, 2020 while in D.O.C. custody.

45.

Prior to becoming sick, Mr. Kennerson was routinely in touch with family. Their discussions included his medical well-being. He never once experienced any of the symptoms he began displaying at C.C.C. that ultimately caused his death.

*Mr. Kennerson's Detention in C.C.C.*

46.

On or about November 18, 2020, Mr. Kennerson was transferred from Beauregard Parish Southwestern Transitional Program to C.C.C.

47.

On or about November 19, 2020, Mr. Kennerson stripped naked and ran out of his cell.

48.

On or about November 20, 2020, C.C.C. reported that Mr. Kennerson was refusing to keep his clothes on and had attempted to run out of his cell during a cell check multiple times. C.C.C. also reported that staff had observed Mr. Kennerson painting his cell with water and defecating on his lunch tray.

49.

On November 20, 2020, C.C.C. contacted Defendant D.O.C. employees Ashli Oliveaux, Selena Holmes, Clara Hodes, Lillie Broan, and Blake LeBlanc about Mr. Kennerson's condition, indicating he had a mental health issue. D.O.C. took no action in response to C.C.C.'s November 20th report despite this plainly bizarre behavior. C.C.C. and its employees took no sufficient action to ensure Mr. Kennerson's safety despite this behavior.

50.

On November 23, 2020, C.C.C. again contacted D.O.C., this time speaking with Defendant Clara Hodas, a Mental Health Administrator. C.C.C. stated it was worried that Mr. Kennerson would hurt himself or others. Ms. Hodas said she would talk to Defendant Blake LeBlanc about potentially transferring Mr. Kennerson. D.O.C. took no adequate action despite the report from C.C.C. about Mr. Kennerson's plainly bizarre behavior. C.C.C. and its employees took no sufficient action to ensure Mr. Kennerson's safety despite this behavior.

51.

Upon information and belief, Mr. Kennerson did not receive any medical care or medication while at C.C.C. prior to November 25, 2020.

52.

Despite all of Mr. Kennerson's symptoms and C.C.C.'s concerns that he would hurt himself or others, Mr. Kennerson did not see a mental health provider or receive a mental health evaluation until November 25, 2020.

53.

During his November 25th mental health evaluation, Mr. Kennerson was diagnosed with acute psychosis. The treating psychiatrist ordered that he be transferred to a higher level of psychiatric care.

54.

Despite all of Mr. Kennerson's symptoms and C.C.C.'s concerns that he would hurt himself or others, upon information and belief, Mr. Kennerson was not placed on suicide watch or in any other similar isolation cell until after his psychiatric evaluation on November 25th—five days after C.C.C. first identified Mr. Kennerson was displaying symptoms of mental illness.

55.

On or about November 25, 2020, Mr. Kennerson was noted to be throwing feces and was largely unable to complete a physical exam.

56.

On or about November 30, 2020, Mr. Kennerson obtained access to roach killer as well as a fire causing agent with which to ignite it. He then smoked the roach killer. On information and belief, C.C.C. staff observed Mr. Kennerson smoke the roach killer or discovered that he had

smoked it on or about November 30, 2020.  However, C.C.C. omitted a report of this incident from its records as there are no notes from C.C.C. from November 25, 2020 to December 2, 2020.

57.

On information and belief, Mr. Kennerson did not receive a medical evaluation or medical treatment after he smoked roach killer on either November 30, 2020 or December 1, 2020.

58.

On Wednesday, December 2, 2020, at or around 3:00pm, Mr. Kennerson was taken from his cell to medical for an evaluation. He was unable to walk and had to be transported in a wheelchair. Mr. Kennerson was lethargic, with a low temperature and low blood pressure. His limbs were also severely swollen. He was not verbally responding to questions from the doctor but would look up when he was spoken to.

59.

Less than 10 minutes after he was taken to medical, Mr. Kennerson was deemed medically unstable and transferred via ambulance to from C.C.C. to the Emergency Room at Riverland Medical Center ("RMC").

60.

At RMC, Mr. Kennerson was diagnosed with Rhabdomyolysis, hepatitis, a head contusion, and a head injury, among other severe health conditions.

61.

RMC staff observed that Mr. Kennerson had a large laceration on his forehead that was oozing with foul-smelling puss. Since Mr. Kennerson was unable to speak, C.C.C. staff reported that his laceration was the result of running into the cell door a few times.



62.

RMC ordered that Mr. Kennerson see a neurologist within 24 hours as well as have a white blood cell count and basic metabolic panel conducted at that same time. RMC also prescribed Mr. Kennerson several prescription medications over the next 10 days.

63.

Mr. Kennerson left RMC and returned to C.C.C. on December 2, 2020.

64.

On approximately December 2, 2020, C.C.C. notified Mr. Kennerson's mother of psychotic symptoms Mr. Kennerson was experiencing, including eating his feces.

65.

On or about December 3, 2020, C.C.C. attempted to contact D.O.C. about transferring Mr.

Kennerson for a third time. C.C.C. called Defendant Hodas but she did not answer her phone so they left a voicemail. C.C.C. also called Defendant Oliveaux but received no answer so they left a voicemail. Several hours after C.C.C.'s calls to Defendants Hodas and Oliveaux, Defendant LeBlanc called back and requested additional information. C.C.C. sent Defendant LeBlanc this information the same day. After Defendant LeBlanc returned C.C.C.'s call, Defendant Oliveaux followed up on the voice message she received and requested C.C.C. send her Mr. Kennerson's records from the E.R.

66.

After returning to C.C.C. on December 2, 2020, Mr. Kennerson remained lethargic and continued to have a low body temperature and significant swelling. Mr. Kennerson remained unable to speak and needed to be transported in a wheelchair.

67.

From December 2, 2020 to December 3, 2020, C.C.C. provided Mr. Kennerson with warm blankets, heat packs, and monitored his body temperature. At or about 5:20pm on December 3, 2020, C.C.C. determined Mr. Kennerson was unstable and called for an ambulance to transport him to the Emergency Room.

68.

From December 3, 2020 to December 4, 2020, Mr. Kennerson was at RMC. He was intubated and RMC staff noted again that he had an altered mental status.

69.

On December 4, 2020, Mr. Kennerson was transferred to Lakeview Regional Medical Center ("LRMC"). At LRMC, it is again noted in his history that he acted increasingly psychotic, including eating his own feces and drinking his own urine.

70.

LMRC records also note that Mr. Kennerson was given access to roach killer which he smoked.

71.

Eight (8) days later, on December 12, 2020, Mr. Kennerson died. The coroner believed his death was attributable to the insecticide he was able to smoke on November 30, 2020.



72.

In sum, after engaging in self-harm, ramming his head into his wall, acting psychotic, eating feces and drinking urine, Mr. Kennerson, in his altered mind state, was still under such poor care and supervision that he was permitted to smoke insecticide, which ultimately caused his death.

73.

Defendants John Does #1-#10, Ben Adams, and Randy Stockman, as the result of de facto

policies and practices permitted by Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown, failed to monitor the living areas of incarcerated people, including where Mr. Kennerson was housed, despite his overt manifestations of psychosis and mental illness.

74.

In particular, LaSalle's failure to monitor living areas of incarcerated people for dangerous instruments—including failure to monitor housing units for people on suicide watch—has been documented in three separate inspection reports by independent agencies in the last five years. LaSalle's failure to meet minimum standards for consistent cell checks of people on suicide watch has been similarly documented in inspection reports by independent auditors. These failures have resulted in multiple suicide deaths in LaSalle facilities, including Mr. Kennerson's death.

75.

Defendants John Does #1-#10, Ben Adams, and Randy Stockman, as the result of de facto policies and practices permitted by Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown, failed to provide Mr. Kennerson sufficient access to qualified medical and mental health care.

76.

Defendants C.C.C. and LaSalle in particular have failed to provide access to qualified medical and mental health care to incarcerated people. C.C.C. and LaSalle regularly force incarcerated people with severe medical conditions to wait close to a week until they receive a medical evaluation and even longer to receive treatment. There are documented prior incidents of

LaSalle forcing incarcerated people to wait until medical staff are scheduled to be at the facility on a particular day of the week to receive urgent care. Mr. Kennerson was subject to this same de facto policy of delay.

77.

Defendants John Does #1-#10, Ben Adams, and Randy Stockman, as the result of de facto policies and practices permitted by Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown, failed to provide Mr. Kennerson sufficient medical and mental health care prior to, and resulting in, his death.

78.

Defendant LaSalle in particular has regularly failed to provide prompt lifesaving care to individuals who sustain an injury or suffer from an illness in their facilities, including failure to provide care to those who self-harm in a suicide attempt. Delays and refusals to provide medical evaluation and treatment have led to over a dozen deaths in LaSalle facilities before Mr. Kenenrson died.

79.

C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown failed to adequately staff and train employees responsible for providing constitutionally adequate medical and mental health care at C.C.C. As a result of de facto policies and practices permitted by Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott,

Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown, C.C.C. employees are not trained or supervised to address and refer serious mental health care needs of incarcerated people to LaSalle Management Company and D.O.C., including those exhibited by Mr. Kennerson, resulting in deliberate indifference to the serious mental health care needs of incarcerated people.

80.

Defendants John Does #1-#10, Ben Adams, and Randy Stockman, as the result of de facto policies and practices permitted by Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown, failed to provide appropriate care when they did not place Mr. Kennerson in safe housing away from any poisonous agents, as several staff members had knowledge of his dangerous and fragile mental state or had witnessed bizarre and alarming behavior by Mr. Kennerson.

81.

Defendants John Does #1-#10, Ben Adams, and Randy Stockman, as the result of de facto policies and practices permitted by Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown, violated Mr. Kennerson's rights as a mentally ill individual under the A.D.A., as D.O.C. received federal funds.

82.

At all times relevant to this complaint, Defendants acted under color of state law.

83.

At all times mentioned herein, all the Defendants named in their individual capacities were

employed by the Defendants D.O.C., LaSalle Management Company, or Catahoula Parish Sheriff's Office and were acting in the course and scope of their employment with Defendants D.O.C., LaSalle Management Company, or the Catahoula Parish Sheriff's Office.

84.

The Defendants' actions were reckless, willful, wanton, and malicious, and constituted deliberate indifference to the rights of the Plaintiff. The Defendants' actions were the proximate cause of the injuries and death of Mr. Kennerson and the damages of the Plaintiff.

85.

All Defendants are liable to Plaintiff for compensatory damages, and Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown, and those sued in their individual capacity are liable to Plaintiffs for punitive damages.

## CAUSES OF ACTION

**COUNT 1 – § 1983 Violation Based on Establishment of a System in which Prisoners withSerious Mental Health Issues are Denied Access to Appropriate Medical Care — Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown (Official Capacities)**

85.

The Defendants named in this count, acting individually and together, under color of law, violated Mr. Kennerson's right to be free from deliberately indifferent medical and mental health care as protected by the Eighth Amendment of the United States Constitution and 42 USC § 1983. They did so by providing inadequate and insufficient services for medical and mental health care

that they knew would result in the deprivation of adequate medical and mental health care for incarcerated people with serious medical conditions, namely, serious mental health conditions. Plaintiff was individually harmed by the insufficiency of the contract and the failure to make other accommodations to provide mental health services because they resulted in the death of Mr. Kennerson, who was deprived of appropriate mental health and medical treatment after he was booked into C.C.C., which deprivation resulted in his death, as described above.

86.

At all pertinent times, the Defendants named in this count, individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety and constitutional and civil rights of Mr. Kennerson by failing to provide appropriate medical and mental health services.

**COUNT 2 – § 1983 Violation Based on Failure to Supervise Other Defendants to Ensure Incarcerated people  Received Appropriate Care for Serious Medical Needs— Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown (Individual and Official Capacities)**

87.

Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown, in their individual and official capacities, failed to supervise their subordinates, namely Defendants John Does #1-#10, Ben Adams, Randy Stockman, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown, to ensure that these subordinates did not ignore obvious signs of medical or mental health distress in incarcerated people or fail to properly monitor them showing signs of mental health crisis.

88.

The Plaintiff was directly harmed by this failure to supervise because it caused the death of Mr. Kennerson, who received patently insufficient treatment for his serious mental health needs from the specified Defendants. At all pertinent times herein, Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown were aware of the need to supervise their subordinates in order to ensure that they did not violate the rights of incarcerated people. These Defendants ignored that need and acted unreasonably and with deliberate indifference and disregard for the safety of Mr. Kennerson, as described above.

89.

Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown, in their individual and official capacities, failed to supervise their subordinates, namely, Defendants John Does #1-#10, Ben Adams, Randy Stockman, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown to ensure that these subordinates did not ignore obvious signs of medical or mental health distress in incarcerated people or fail to properly monitor them showing signs of mental health crisis. They also failed to ensure that their subordinates provided reasonable and sufficient treatment for incarcerated people with mental health conditions and properly monitored those being treated. The Plaintiff was directly harmed by this failure to supervise because it caused the death of Mr. Kennerson, who received patently insufficient treatment for his serious mental

health needs from the specified Defendants.

90.

At all pertinent times herein, Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown were aware of the need to supervise their subordinates in order to ensure that they did not violate the rights of incarcerated people. They ignored that need and acted unreasonably and with deliberate indifference and disregard for the safety of Mr. Kennerson, as described above.

**COUNT 3 – § 1983 Violation Based on Deliberate Indifference to Mr. Kennerson's Constitutional Right to Be Free From Deliberately Indifferent Medical and Mental Health Care**

**Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, Lillie Brown, John Does #1-#10, Ben Adams, Randy Stockman (Individual Capacities)**

91.

The above-named Defendants, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that acted to deprive Mr. Kennerson of his constitutional rights and did deprive him of said rights, specifically, the right to be free from deliberately indifferent medical and mental health care.

92.

At all times pertinent herein, these Defendants, acting individually and collectively, acted unreasonably, recklessly, maliciously, and/or with deliberate indifference and disregard for the constitutional and civil rights and life and serious mental health needs of the deceased, Mr. Kennerson.

93.

Furthermore, these Defendants, individually and collectively, had the duty and ability to intervene to prevent the violation of Mr. Kennerson's rights, as described herein, but failed to do so.

94.

Finally, these Defendants acted as a final policy maker when they placed a psychotic Mr. Kennerson in a cell with access to fatal insecticide to ingest, and deprived Mr. Kennerson of reasonable and adequate mental health care, having been delegated the authority to do so by Defendants D.O.C, James LeBlanc, C.C.C. and LaSalle Management Company.

**COUNT 4 – Monell Violation of § 1983 Based on Establishment of Policies, Patterns or Practices pursuant to which Incarcerated People with Serious Mental Health Conditions are Denied Access to Appropriate Medical Care— Defendants D.O.C., James LeBlanc, Sheriff Edwards, C.C.C., and LaSalle Management Company (Official Capacities)**

95.

The Defendants named in this count, D.O.C., James LeBlanc, Sheriff Edwards, C.C.C., and LaSalle Management Company, acting individually and together, under color of law, acted to violate Mr. Kennerson's right to be free from cruel and unusual punishment as protected by the Eighth Amendment of the United States Constitution and 42 USC § 1983. They did so by establishing and maintaining policies, patterns or practices that they knew would deprive incarcerated people with serious medical conditions, namely, serious mental health disorders, of treatment for those disorders.

96.

The Plaintiff was harmed by these policies, patterns, or practices because they resulted in the death of Mr. Kennerson, who was deprived of appropriate medical and mental health treatment

after he was booked into C.C.C. despite the obvious, acute, and severe emotional and mental distress he was suffering. These deprivations resulted in his death, as described above.

97.

At all pertinent times, the Defendants named in this count, individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional, and civil rights of the Plaintiff by establishing the above-described policies, patterns, or practices. The Defendants named in this count further failed to take reasonable steps to prevent the deaths of incarcerated people in their care, including Mr. Kennerson.

98.

The above-named Defendants are therefore liable to the Plaintiff for the violation of constitutional rights described above pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

**COUNT 5– State Claim of Negligent and/or Intentional Conduct Resulting in Injury and Death— Defendants John Does #1-#10, Ben Adams, Randy Stockman, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown (Individual Capacities)**

99.

The above-named Defendants, acting individually and together, and under color of law, engaged in a course of conduct that deprived Mr. Kennerson of appropriate mental health treatment, causing harm to Mr. Kennerson that ultimately led to his death. At all times pertinent herein, these Defendants, individually and collectively, acted intentionally, maliciously, recklessly, and/or negligently towards the deceased, Mr. Kennerson. Furthermore, these Defendants, individually and collectively, had the duty and ability to intervene upon observing or being made aware of Mr. Kennerson's clearly peculiar behavior but failed to do so.

**COUNT 6 – State Claim of Respondeat Superior Liability of Defendants D.O.C., C.C.C.,**

**Sheriff Toney Edwards, LaSalle Management Company Under La. C. C. art. 2320**

100.

At all relevant times, the individually named Defendants were acting in the course and scope of their employment with Defendants D.O.C., C.C.C., Sheriff Toney Edwards and LaSalle Management Company and are therefore liable under the doctrine of *respondeat superior*, La. C. C. 2320, for all state law causes of action and liability arising due to the actions and inactions of the individual Defendants, as described herein.

### COUNT 7 – Loss of Consortium—All Defendants

101.

Defendants are liable to Jennifer Bartie, pursuant to La. C.C. art. 2315(B) and 42 U.S.C. § 1983, for loss of service, society, support, love and affection arising out of the injuries occasioned by the acts and/or omissions of the Defendants herein.

### COUNT 8 – Wrongful Death Claim of Jennifer Bartie

102.

Jennifer Bartie is the surviving mother of Mr. Kennerson, who seeks to recover for the damages she sustained as a result of the death of her son due to the fault of Defendants.

103.

The deceased left no surviving wife or children.

### COUNT 9 – Survival Action Claim of Jennifer Bartie

104.

Jennifer Bartie seeks relief under La. C.C. art 2315.2 for the pain and suffering occurring before and during Mr. Kennerson's death occasioned by the intentional and/or grossly negligent acts and/or omissions of the Defendants herein, and for all other relief as set forth herein.

**COUNT 10 – State Claim of Direct Action Against an Insurer, Pursuant to LA R.S. § 22:1269**

105.

At all applicable times, Defendant ABC Insurance Company, XYZ Insurance Company, and RST Insurance Company afforded liability insurance coverage to Defendants. Accordingly, ABC Insurance Company, XYZ Insurance Company, and RST Insurance Company are liable to the Plaintiff for the intentional and/or negligent acts of the other Defendants.

**COUNT 11 – State Claim for Breach of Duty to Provide Medical Treatment— D.O.C. and LaSalle Management Company**

106.

Under Louisiana law, D.O.C., as the confining authority, has a legal duty to provide appropriate medical and mental health treatment for incarcerated people.

107.

For the facility C.C.C., D.O.C. contracted with LaSalle Management Company to provide such medical and mental health treatment.

108.

D.O.C. and LaSalle Management Company failed to provide medical and mental health treatment within C.C.C. that was adequate and reasonable as required by law.

109.

Mr. Kennerson's death was a direct result of D.O.C. and LaSalle Management Company's failure to provide adequate and reasonable mental health care.

**COUNT 12- Failure to Protect Under State Law—All Defendants**

110.

Under La. C.C. Art. 2315, Defendants are also liable to Plaintiff under state law. The

Defendants had a duty to protect Mr. Kennerson. His mental health issues were very pronounced and known to all Defendants. Nevertheless, they provided him with constitutionally inadequate mental health and medical treatment. Further, they placed him in a cell where he had access to poison and failed to monitor to him, enabling him to ingest it. The D.O.C., C.C.C., Sheriff Edwards, and LaSalle Management Company are vicariously liable for the state law delicts of their servants.

**COUNT 13 – VIOLATION OF THE ADA**
**Defendants C.C.C., D.O.C. James LeBlanc, LaSalle Management Company, Sheriff Edwards, Warden Ford, Warden Wiley, Assistant Warden Stott, Chief Warden Book, Ashli Oliveaux, Selena Holmes, Clara Hodas, and Lillie Brown**

111.

D.O.C. receives federal funding and is thus required to comply with the A.D.A. Law defines "a qualified individual with a disability" as a person who suffers from a "physical or mental impairment that substantially limits one or more major life activities" including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(1)(A), (2)(A).

112.

Under the ADA, Defendant D.O.C. must provide incarcerated people with disabilities reasonable accommodations and modifications so that they can avail themselves of and participate in all programs and activities offered by Defendants. Here, Defendants failed to "implement reasonable policies, including physical modifications to additional cells in accordance with the 2010 [accessibility] standards, so as to ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing."

28 C.F.R. § 35.152(b)(3). Defendants also failed or refused to provide reasonable accommodations and other services related to the disabilities of incarcerated people. See generally 28 C.F.R. § 35.130(a). Finally, Defendants failed to "ensure that incarcerated people or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." 28 C.F.R. § 35.152(b)(2).

113.

Here, Mr. Kennerson's mental illness constituted a "qualified individual." However, Defendants did not provide proper accommodations, medical and mental health treatment, or safe housing despite his condition.

INJURIES

114.

As a result of the actions of the Defendants, as described above, damages have been incurred as follows: Mr. Kennerson (deceased) suffered conscious and severe physical, mental, and emotional distress, pain and suffering prior to his death, and lost his life. Jennifer Bartie suffered emotional pain and suffering, past, present, and future, has suffered the loss of love, affection, and companionship of her son, and has incurred funeral and burial expenses.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that after due proceedings there be judgment rendered herein in Plaintiff's favor and against all Defendants individually and jointly, as follows:

a)   Compensatory and punitive damages as prayed for herein;

b)   Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794(b) and all costs of these proceedings and legal interest;

c)   Punitive damages pursuant to 42 U.S.C. § 1983 and any other applicable statute;

d)      Relief under La. C.C. arts. 2315 and 2321 from the intentional and/or negligent

acts and/or omissions of the Defendants herein; and

e)      All other relief as appears just and proper to this Honorable Court.

Respectfully submitted, this 16th day of August, 2022.

MURELL LAW FIRM

/s/: *Christopher J. Murell*
CHRISTOPHER J. MURELL, T.A.
Louisiana Bar Number: 32075
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
chris@murell.law

LAW OFFICE OF VERITY GENTRY

*/s/: Verity Gentry*
VERITY GENTRY
Louisiana Bar Number: 33143
1532 Irving Place
Shreveport, Louisiana 71101
690 San Antonio Avenue, Suite B
Many, Louisiana 71449
(318) 701-8127 Telephone
verity@vgblaw.com

NATIONAL POLICE ACCOUNTABILITY
PROJECT

/s/: Lauren Bonds
Lauren Bonds*
Kansas Bar Number: 27807
1403 Southwest Boulevard
Kansas City, Kansas 66103
(620) 664-8584 Telephone
legal.npap@nlg.org

Keisha James*
DC Bar Number: 1658974
PO Box 56386
Washington, DC 20040

(202) 557-9791 Telephone
keisha.npap@nlg.org

Eliana Machefsky*
California Bar Number: 342736
2111 San Pablo Avenue
PO Box 2938
Berkeley, CA 94702
(314) 440-3505 Telephone
fellow.npap@nlg.org

THE CLAIBORNE FIRM, P.C.

/s/: *David J. Utter*
DAVID J. UTTER
Louisiana Bar Number: 2323

WILLIAM R. CLAIBORNE*
Georgia Bar Number: 126363
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com
will@claibornefirm.com

*admitted *pro hac vice*

ATTORNEYS FOR PLAINTIFF